# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### FORT MYERS DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                    **CASE NO: 2:11-CR-97-FtM-29SPC**

**JUDE SEREME and**
**JOPHANEY HYPPOLITE**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on Defendant Jude Sereme's Motion to Suppress Evidence and Memorandum of Law (Doc. #120) filed on February 9, 2012. Co-Defendant Jophaney Hyppolite moved to adopt Sereme's Motion to Suppress Evidence (Doc. #127) on February 13, 2012. The United States filed its Response to Defendant Hyppolite's Motion to Adopt Co-Defendant Sereme's Motion to Suppress Evidence (Doc. #138) on February 15, 2012. The United States' Response to Defendant Sereme's Motion to Suppress Evidence and Incorporated Memorandum of Law (Doc. #144) was filed on February 23, 2012. The Court held a hearing on the Motions on March 8-9, 2012, during which time the Court heard testimony on the Motion and argument from counsel for both parties. Defendant Sereme was present and represented by Assistant Federal Public Defender, Russell Rosenthal. Defendant Hyppolite was present and represented by attorney, John Mills. The Government was represented by Assistant United States Attorney, Jesus Casas.

## BACKGROUND

A joint Florida Department of Law Enforcement and Federal Bureau of Investigation task force conducted an ongoing investigation into the drug trafficking operation ("DTO") of the Haitian MOB, an organization which traffics illegal narcotics from Miami, Florida to the Ft. Myers, Florida area. As part of this investigation, agents and officers have employed various investigative techniques, including the use of confidential informants as well as cell site location technology to trace the cellular telephones of members of the DTO.

Based on this investigation, on September 28, 2011, Defendant Sereme and nine co-defendants were indicated by a Grand Jury and are charged in Count I with conspiracy to possess with intent to distribute cocaine base from an unknown date, but at least by July 2010 through September 28, 2011. Sereme is additionally charged in Count III with possession with intent to distribute cocaine base on December 20, 2010. Count II relates to a seizure of cocaine base from Sereme's person, following the stop of an automobile in which he was a passenger in the vicinity of Bass Road and Summerlin Road in Lee County, Florida. The Government maintains that the December 20, 2010 incident was in furtherance of the conspiracy alleged in Count I. Therefore, it appears the Government will seek to introduce evidence of the seizure of cocaine from Sereme's person on December 20, 2010, in support of both Counts alleged against him.

Sereme was arrested on state charges following the seizure, and was incarcerated until February 9, 2011. While in custody, he is alleged to have made several telephone calls which were recorded by the Lee County Sheriff's Office, and which the Government intends to offer at trial.

## *The December 20, 2010 traffic stop and events leading up to it*

On December 7, 2010, Florida Department of Law Enforcement Special Agent Ronnie Austin (Spec. Agt. Austin) applied to Lee County Circuit Judge Mark A. Steinbeck, and received authorization for cell site activation locations for cellular telephone number 239-222-5448 ("the target telephone") (Def. Ex. A), whose service was provided by Sprint. As indicated in the Affidavit, the target telephone was believed to be used by the Defendant, Jude Sereme. However, the subscriber record for the telephone number listed Latora Brown with a Miami address as the subscriber. This Order authorized the installation of both a pen register device with enhanced caller identification and a trap and trace device for the cellular phone number. In addition to the above information, this application requested that the cellular phone carrier, Sprint, "at the request of the above-stated agencies please provide the longitude and latitude (GPS) of location if available." (Def. Ex. A, p. 2).

On or about December 8, 2010, Spec. Agt. Austin began to receive cell site locations for the target telephone. The cell site locations were received based upon accessing Sprint's law enforcement website portal and setting up the parameters for which the cell site information would be received. The cell site information is capable of being received at different time intervals, every five minutes being the smallest interval. On or about December 9, 2010, surveillance was conducted on the Linda Loma subdivision of Fort Myers, Florida, after information was received indicating that Defendant Sereme was in the area. As a result of the surveillance, a red Ford Edge, owned by Avis/Budget, was located at 16860 Carmen Avenue. The red Ford Edge was rented by Marie Pierre of Miami, Florida.

On December 10, 2010, FBI Special Agent Ryan Davis (Spec. Agt. Davis) was contacted by Spec. Agt. Austin who advised that the target telephone had been at a particular Wal-Mart in

Fort Myers, Florida. Spec. Agt. Davis then contacted Wal-Mart's Loss Prevention employee who allowed him to view surveillance video that showed Sereme getting into a red Ford Edge similar to the rental vehicle previously identified in the Linda Loma subdivision. Spec. Agt. Davis contacted Avis/Budget again and was advised that Marie Pierre had returned the red Ford Edge and had obtained a silver Ford Edge. The information was provided to Spec. Agt. Davis prior to December 20, 2010.

On December 20, 2010, Spec. Agt. Davis was advised that the target telephone was traveling from the Ft. Myers, Florida area, to the Miami, Florida area. Later that evening, Spec. Agt. Davis also learned that the target telephone was returning in the direction of the Fort Myers, Florida area. As a result, he contacted other law enforcement officers in an effort to locate the vehicle that contained the target telephone and establish probable cause for a traffic stop of the occupants.

On December 20, 2010, the silver Ford Edge in which Sereme was a passenger was pulled over by Lt. Pete Hedrick (Lt. Hedrick) for illegal tint and speeding. The general vicinity that the vehicle was in was known through the use of cell site locator information used to track the cellular telephone. The driver, Johnny Pierre was asked to step out of the vehicle, patted down, and consented to the search of the vehicle. He admitted that they had been smoking marijuana and there still might be some in the vehicle. After Sereme was removed from the vehicle, a search of the vehicle yielded no contraband or illegal narcotics. Sereme was patted down upon exiting the vehicle and then subsequently searched after the search of the vehicle yielded no contraband. The second search of Sereme revealed cocaine concealed in his buttocks. Sereme was arrested and placed in the Lee County Jail.

### *The Wiretaps*

On July 11, 2011, the Government submitted an application for a Title III wiretap intercept of phone number 239-384-1052. On August 12, 2011, the Government submitted an application for the continued intercept of this phone number, and for an initial intercept for phone number 754-244-3916. On September 19, 2011, the Government submitted an application for an initial intercept of 239-321-1233. In the Affidavits (Def. Ex. D-E) supporting the wiretap applications, one of the Government's allegations was that it had received information that Sereme and others were engaged in drug distribution from various houses in the Fort Myers, Florida area. The Affidavits alleged that this information, provided by confidential informants, was verified by the December 20, 2010 seizure from Sereme, as well as the recorded telephone jail conversations following his arrest. The recorded jail conversations were also made part of the Affidavits used to secure the wiretap intercept orders. Based upon these applications, the Honorable John E. Steele issued Title III wiretap intercept orders for the three telephone lines.

## TESTIMONY

### *Special Agent Ryan Davis (Tr. 7:4-61:15)*

Ryan Davis has been an agent with the Fort Myers Federal Bureau of Investigation since April 2010. (Tr. 7:4-10). Prior to that time, he was a police officer in Youngstown, Ohio. (Tr. 7:11-13). In approximately September of 2010, Spec. Agt. Davis began participating in the investigation of Defendant Jude Sereme relating to drug trafficking. (Tr. 7:14-22). On December 8, 2010, Spec. Agt. Davis enlisted the support of Spec. Agt. Austin of the Florida Department of Law Enforcement to seek and obtain authorization for cell site location information for cellular telephone number 239-222-5448. (Tr. 7:23-8:4). Spec. Agt. Austin obtained a court order (Def. Ex. A) authorizing that cell site location information be provided to

him and others in furtherance of the investigation. (Tr. 8:11-16). The subscriber for that telephone number was listed as Latora Brown, who was believed to be either a girlfriend or common law spouse of another member of the DTO. (Tr. 8:17-9:14). Once the order was obtained, Spec. Agt. Austin would set up email notifications from Sprint's law enforcement website that would provide a GPS location of the phone within an approximate distance of the phone, including longitude and latitude. (Tr. 9:20-10:7). Spec. Agt. Davis explained that the location information was delayed and was not a real time track. (Tr. 10:8-20). He explained that any information regarding Sereme's phone was being relayed to him by Spec. Agt. Austin. (Tr. 11:4-12). He believed it was Sereme's phone because a confidential source had called Sereme at that phone number in October 2010. (Tr. 11:16-19).

On December 10, 2010, the phone was located at a Wal-Mart in Fort Myers, Florida. (Tr. 12:5-10). Spec. Agt. Davis immediately went to the Wal-Mart and spoke with loss prevention and had them roll back the video of the security camera so he could see who exactly had come to the Wal-Mart store with that phone and if any other persons were with him. (Tr. 12:20-13:2). He was not able to see the phone in the video but did see two individuals who he recognized as Defendants Sereme and R. Jean who were targets of the investigation prior to that day. (Tr. 13:3-13). The video showed them purchasing some items and then walking out into the parking lot and getting into two vehicles – a red Ford Edge and a black Dodge Charger. (Tr. 13:14-21). Sereme got into the Ford Edge – a rental vehicle – which was previously identified in the Linda Loma neighborhood on December 9, 2010. (Tr. 13:16-14:2).

Agents received information on December 9, 2010, regarding the red Ford Edge and found out that it was rented by a woman by the name of Marie Pierre, with an address in Miami,

Florida. (Tr. 14:3-8). The red Ford Edge was returned to the rental company on December 20, 2010, and a silver Ford Edge was rented that same day. (Tr. 14:13-15:6).

On December 20, 2010, at approximately 6:30pm, Spec. Agt. Davis was receiving email notifications regarding the phone and he saw that the phone was on Interstate 75 in Miami, heading North in the direction of Fort Myers, Florida. (Tr. 15:7-15). He then contacted another special agent working the investigation and a Lee County Detective, who came out with him to conduct surveillance on Interstate 75 to see if they could locate the phone. (Tr. 15:23-16:3). He also contacted Collier County Sheriff's Office interdiction team as well as the Lee County interdiction team to assist in locating the vehicle. (Tr. 16:4-7). He made an educated guess that the vehicle they were looking for was the silver Ford Edge. (Tr. 16:10-14). They were not successful in locating the vehicle on Interstate 75 because the updates as to the phone's location were not fast enough and so the officers just fanned out in the area to locate the vehicle. (Tr. 17:11-21). Spec. Agt. Davis assumed that the vehicle was headed to the Linda Loma neighborhood as it seemed to be the main location for the phone being used by Sereme and other members of the DTO. (Tr. 18:5-13).

They were successful in locating the silver Ford Edge on Gladiolus Road in Fort Myers, Florida. (Tr. 18:21-19:6). The interdiction unit took over and found probable cause to conduct a traffic stop. (Tr. 19:16-22). The stop occurred near the intersection of Summerlin Road/Bass Road. (Govt. Ex. 1) (Tr. 20:17-21:2). Spec. Agt. Davis testified that he did not tell the interdiction unit to conduct the traffic stop, but told them that it was up to them to develop their own probable cause and conduct the stop in the manner that they saw fit. (Tr. 24:19-25).

Sereme was arrested following the traffic stop when he was found to be in possession of a quantity of cocaine. (Tr. 25:1-6). He was then lodged in the Lee County Jail. (Tr. 25:7-8).

During the time that Sereme was in the Lee County Jail, Spec. Agt. Davis monitored the phone calls made by Sereme. (Tr. 25:9-14).

Eventually Spec. Agt. Davis applied for and obtained authorization to intercept communications occurring over two different telephones, the first being 239-384-1052. (Tr. 25:17-23). Agents believed that Rick Jean was using that telephone through confidential source information. (Tr. 25:24-26:7). Agents obtained this phone number independently of the jail conversations. (Tr. 26:8-14). Spec. Agt. Davis also eventually applied for and obtained authorization to intercept communications occurring over 754-244-3916. (Tr. 26:15-19). They identified that particular phone through intercepted communications of R. Jean's phone (239-384-1052) and not through any jail conversations. (Tr. 26:20-23, 27:2-4).

On cross-examination, Spec. Agt. Davis testified that the phone believed to be used by Sereme that was used to track him for the December 20, 2010 traffic stop, was monitored continuously for a period of 12 days. (Tr. 30:17-21). During that time, Sprint provided law enforcement with information as to where the phone was located. (Tr. 30:22-24). Spec. Agt. Davis received emails from Sprint every 15 minutes with updates as to the location of the phone. (Def. Ex. B & C) (Tr. 35:4-7).

Spec. Agt. Davis identified Sereme's voice on the intercepted conversations pursuant to the wiretap orders partially through the jail conversations that he listened to. (Tr. 41:20-45:15). But he conceded that there were no other samples of Sereme's voice that he used to make the voice identifications in regard to the affidavits other than the jail conversations. (Tr. 46:3-11).

On July 12, 2011, the wiretap intercept was authorized for phone number 239-384-1052. (Tr. 48:12-18). The number is one of the numbers Sereme was alleged to have called from the Lee County Jail. (Tr. 48:19-22). Spec. Agt. Davis could not cite to any evidence that the phone

number was known prior to Sereme's arrest on December 20, 2010. (Tr. 49:18-20). The intercept on that line began in July 2011. (Tr. 49:22-24). A second intercept order was obtained on August 12, 2011 for the continued intercept of 239-384-1052 and for a new intercept of 754-244-3916. (Tr. 50:3-13). The conversations intercepted for the first number were used as the basis to receive the intercept of the second. (Tr. 50:21-51:5). The intercept of 239-384-1052 led law enforcement to the 754-244-3916 phone number. (Tr. 51:6-14).

*Lieutenant Pete Hedrick (Tr. 62:13-83:11; 140:24-146:11)*

Pete Hedrick is a lieutenant with the Lee County Sheriff's Department. (Tr. 62:13-18). He has been with the Lee County Sheriff's Office for 19 years. (Tr. 62:19-21). He is currently the commander of the criminal interdiction unit. (Tr. 62:22-25). Over his career he has participated in approximately 10,000 traffic stops, with thousands of stops for window tint violations and speeding violations. (Tr. 63:8-18).

On December 20, 2010, a detective with the narcotics division contacted him and requested assistance in effecting a traffic stop. They had information that two suspects that were involved in narcotics trafficking were traveling back from Miami, Florida, and they wanted Lt. Hedrick's unit to see if they could establish probable cause to stop the vehicle for them. (Tr. 64:1-8). They were provided with a vehicle description and a tag number. (Tr. 64:9-10). He first spotted the vehicle approximately 8:30pm between U.S. 41 and Summerlin Road, on Gladiolus. (Tr. 64:19-22). Initially they were set up on Interstate 75, but the agents had begun looking for the vehicle and could not locate it, so they spread out through the area. (Tr. 65:2-8).

When he first saw the vehicle he noticed that it was "tinted out" as the front and back windows were tinted dark. (Tr. 65:9-17). The way Lt. Hedrick gauges the tint in his experience is if it is at night and he can see the lights of the cluster of gauges in the front of the vehicle, then

the tint complies with Florida law.  (Tr. 65:18-66:5).  In this case, he could not see the gauges and he could not see the outline of people from the front window.  (Tr. 66:3-5).  Based on his training and experience, he believed the tint was too dark.  (Tr. 66:6-9).  Lt. Hedrick also paced the vehicle going 58 miles an hour in a forty-five mile per hour zone.  (Tr. 66:12-17).  He then conducted a traffic stop of the vehicle.  (Tr. 66:18-20).

Lt. Hedrick was alone in his vehicle when he conducted the traffic stop and the vehicle pulled over into the right-turn lane as if pulling onto Bass Road off Summerlin Road.  (Tr. 66:25-67:7).  He made contact with the driver, Johnny Pierre, and Defendant Sereme was in the passenger seat, along with a small child, maybe eight years old, in the back seat.  (Tr. 67:8-15).  When he first approached the driver's side of the car, he smelled the odor of marijuana coming from the vehicle, which he has had the occasion to smell hundreds of times.  (Tr. 68:1-12).  The driver was asked to step out of the vehicle and walk back to his patrol car which was probably 20-25 feet behind the suspect vehicle.  (Tr. 68:22-69:8).  The driver said his child had to go to the bathroom which is why he was speeding.  (Tr. 69:11-14).  The driver also said that he had added the tint to the vehicle because he did not like too much sun in the vehicle.  (Tr. 69:15-19).

Detective Stephen Kirkby arrived within about two minutes of the traffic stop.  (Tr. 70:2-3).  Det. Kirkby was asked to retrieve the rental agreement from the vehicle while Lt. Hedrick maintained contact with the driver.  (Tr. 70:4-11).  Det. Kirkby obtained the rental agreement and indicated to Lt. Hedrick that he could also smell marijuana coming from the vehicle.  (Tr. 70:12-23).  During the course of Lt. Hedrick's contact with the driver, he questioned him about the odor of marijuana and he advised that they had been smoking marijuana in the vehicle.  (Tr. 70:24-71:6).  Lt. Hedrick then asked the driver for consent to search the vehicle, Pierre consented and a search was conducted.  (Tr. 71:7-13).  During the course of the search only residual or

"shake" marijuana was found throughout the passenger compartment, but it was ground into the carpet. The true source of the odor was never found. (Tr. 71:14-22).

The driver advised that there might still be some buds of marijuana in the ashtray or a cup in the center console. (Tr. 72:2-12). However, the officers found no buds. (Tr. 72:14-19). Both Pierre and Sereme were patted down when they exited the vehicle; the purpose being officer safety and based on the smell of marijuana. (Tr. 73:4-13). The patdowns did not reveal any contraband or weapons. (Tr. 79:25-80:4).

Another officer arrived at the scene and Det. Kirkby came to the vehicle and discussed with Lt. Hedrick that Pierre and Sereme did not appear nervous. Since no contraband was found Lt. Hedrick thought that Sereme should be searched again, which was done by Det. Kirkby. (Tr. 73:14-74:4).

On cross-examination, Lt. Hedrick acknowledged that this was not a routine traffic stop, but they had received information that the vehicle was involved in narcotics trafficking. (Tr. 75:19-76:4). Det. Kirkby had a video camera on the end of his flashlight which was turned on when he approached the passenger in the vehicle. (Tr. 76:8-19). Everything from that point on was recorded. (Tr. 77:4-6). Lt. Hedrick searched the vehicle for roughly half an hour during which time he removed containers, opened containers, and thoroughly searched the vehicle. (Tr. 78:11-23). The search of the vehicle did not reveal any contraband. (Tr. 78:24-79:3).

Upon being re-called by the Government on the second day of the hearing, Lt. Hedrick testified that with respect to the window tint violation, he confirmed his belief that the window tint was in fact illegal on the silver Ford Edge by using the department-issued window tint meter. (Tr. 141:14-21). He conducted the tint check after the contraband was discovered on Defendant Sereme and he was arrested. (Tr. 145:1-9).

*Detective Stephen Kirkby (Tr. 83:21-138:17)*

Stephen Kirkby is a detective with the Lee County Sheriff's Department's criminal interdiction unit. (Tr. 83:21-84:3). He has been with the Lee County Sheriff's Office since June 2005. (Tr. 84:4-6).

On December 20, 2010, Det. Kirkby arrived on the scene to assist Lt. Hedrick in the traffic stop. (Tr. 84:7-17). Prior to his arrival, Lt. Hedrick had the vehicle stopped for approximately five minutes. (Tr. 84:18-20). When he arrived Lt. Hedrick was speaking with the driver by his patrol car and conducting a written warning. (Tr. 85:9-13). Det. Kirkby then made contact with the passenger and asked him for the rental agreements while recording it with the video camera at the end of his flashlight. (Tr. 86:9-22). He obtained the rental agreement from the Defendant and the passenger advised that they were coming from Miami to Fort Myers to visit some girls. (Tr. 86:23-87:13).

Prior to the search of the vehicle, based on his training and experience, Det. Kirkby smelled the odor of marijuana coming from inside the vehicle. (Tr. 88:10-15). He testified that the smell was very heavy. (Tr. 88:24-25). Det. Kirkby was able to assist in the search of the vehicle when another officer arrived. (Tr. 89:15-21). He decided based on the fact that nothing was found in the vehicle to conduct a further search of the Defendant. (Tr. 90:16-20). He then approached Sereme who was standing to the side of Lt. Hedrick's patrol car with the other officer. (Tr. 90:21-91:2). The location where the search was conducted was not visible from the roadway as there were bushes and trees on one side and vehicles on the other. (Tr. 91:10-15).

Det. Kirkby testified that when he went back to search Sereme he set the flashlight on the back of his patrol car and the Defendant immediately put his hands on the back of the car. (Tr. 91:16-24). At that point he conducted a more thorough search of Sereme. When Sereme was

asked if he had any guns or weapons on him, he indicated he did not. (Tr. 92:2-6). He first did an exterior search of the Defendant during the course of which he detected something in the buttocks of the Defendant. (Tr. 92:7-14). Det. Kirkby testified that the Defendant was a large individual with tight jeans on. (Tr. 92:15-25). Once he felt there was something in the buttocks area, Det. Kirkby asked him to unbutton the front of his jeans so he could get a better search of his waistline area because the jeans were so tight he could not conduct a thorough search of that area. Sereme complied. (Tr. 93:1-8). He also had him pull down his jeans a little. (Tr. 93:11-16).

Det. Kirkby continued to examine the Defendant with the benefit of his flashlight. As Det. Kirkby was searching the front of the Defendant's jeans, he saw a white, powdery substance falling down between Defendant's legs and at that point he went behind him and searched the buttocks area by pulling back the waistband of Defendant's underwear. (Tr. 93:23-94:9). He then saw a plastic baggie sticking out between Defendant's buttock cheeks. (Tr. 94:10-12). At that point Det. Kirkby released the band of the underwear and placed handcuffs on the Defendant. (Tr. 94:13-19). He then read him his rights. (Tr. 95:1-4). Det. Kirkby then recovered the baggies from Defendant's buttocks by pulling back his waistband without exposing him to anyone. One baggie fell out on its own, but Det. Kirkby had to pull out the other two. (Tr. 95:15-20). The items recovered were presumptively positive for the presence of cocaine. (Tr. 95:23-25). Approximately 86 grams were recovered in three separate baggies. (Tr. 96:1-5). Det. Kirkby also testified that during the time he was standing near Sereme, he could smell the odor of marijuana on him. (Tr. 102:14-24).

On cross-examination, Det. Kirkby testified that during the traffic stop they were looking for any type of illegal narcotics that could have been in the vehicle. (Tr. 111:17-112:2). He

testified that Lt. Hedrick was searching for unsmoked marijuana as the odor in the vehicle was very strong. (Tr. 123:22-124:6). On the video of the traffic stop, Det. Kirkby can be heard asking Lt. Hedrick if he had "any ideas" as to what to do because they had not found any drugs. (Tr. 122:23-123:7). Det. Kirkby then went to search Sereme again.

## DISCUSSION

Defendant moves to suppress the cocaine found on Defendant's person during the December 20, 2010 traffic stop, the recorded jail conversations, the telephone conversations that were intercepted pursuant to the Title III order, and voice identifications made by the FBI of Sereme. Counsel for the Defendant also stated at the hearing that he moves to suppress any evidence that was obtained as a result of the illegality that occurred on December 20, 2010. Specifically, Defendant alleges that the use of GPS technology to track Sereme's movements was an unlawful search in violation of the Fourth Amendment and thus the traffic stop was unlawful, the search of the Defendant was an unlawful strip search, and the Title III intercept affidavits, which incorporated the results of the search of the Defendant on December 20, 2010, and his jail conversations, lacked probable cause. Given the nature of the events in this case, the Court will begin with a discussion of the technology that was used to locate Sereme.

### I. The Use of GPS Technology to Track Sereme's Movements

In order to track Sereme through the cell phone, the Government applied to Judge Mark Steinbeck for an order compelling Sprint to provide access to the location data. (Def. Ex. A). The Government obtained that Order on December 8, 2010, and began tracking cell site locations for the target telephone and agents began accessing Sprint's law enforcement website portal and setting up the parameters for which the cell site information would be received. (Def. Ex. A).

The cell site information was capable of being received at different time intervals, every five minutes being the smallest interval.

The information that was received from the cellular phone assisted officers in locating the vehicle in which Sereme was a passenger on December 20, 2010. (Tr. 40:17-25). On that date, the cell site location data was being provided to Spec. Agt. Austin approximately every five minutes. Spec. Agt. Davis then contacted law enforcement officers in an effort to locate the vehicle that contained the target telephone and establish probable cause for a traffic stop of the occupants.

Defendant challenges the use of the GPS tracking of the target phone that was in the vehicle in which Sereme was traveling on December 20, 2010, and moves to suppress the information and data obtained from such tracking. Sereme maintains that the interception of his movements by the use of the GPS device constituted a warrantless search in violation of the Fourth Amendment.

**A. Standing**

As an initial matter, the Government alleges that Sereme lacks standing to challenge the cell site activation authorization and implementation relating to the target telephone because Sereme has neither pled nor proven that he had a property interest in the target telephone or a reasonable expectation of privacy associated with the location of the target telephone. The Government argues that there is no evidence that Sereme was in exclusive possession of the phone and it was not registered to him. Defendant Sereme argued at the hearing that the GPS intercept resulted in a stop of a vehicle in which he was a passenger, thus conferring standing.

It is well established that in order for a defendant to move to suppress evidence, he must have standing. United States v. Eyster, 948 F.2d 1196, 1208-09 (11th Cir. 1991). A defendant

has the burden of showing standing under the Fourth Amendment standard. United States v. Brazel, 102 F.3d 1120, 1147 (11th Cir. 1997). To claim the protection of the Fourth Amendment, an individual must have a "reasonable expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). A defendant's expectation must be "personal[ ]" and "reasonable," and it must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (citations and internal quotations omitted). "Standing does not require an ownership interest in the invaded area." United States v. Hernandez, 647 F.3d 216, 219 (5th Cir. 2011) (noting that the Supreme Court has recognized that an overnight guest in a home has a legitimate expectation of privacy in that home).

In order to contest an order permitting the interception of communications, a defendant must establish that he was an "aggrieved person." 18 U.S.C. § 2518(10)(a). Such a person is defined in the relevant statute as a "person who was a party to an intercepted ... communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The statute further allows that an "aggrieved person" may "move to suppress the contents of any ... communication intercepted pursuant to this chapter." 18 U.S.C. § 2518(10)(a). Courts have found that where a defendant does not show any possession, ownership, or control over a phone and the phone was not registered in his name, he does not have standing to challenge the data derived from it. See United States v. Degaule, 797 F. Supp. 2d 1332, 1362 (N.D. Ga. 2011); United States v. Skinner, No. 3:06–CR–100, 2007 WL 1556596, at *15, *17 (E.D. Tenn. May 24, 2007) (finding defendant lacked standing to assert a Fourth Amendment protected interest in cell phone not subscribed in his name and had no statutory right to privacy in the phone); United

States v. Castillo–Martinez, No. 04–CR–6128L, 2007 WL 1026363, at *5 (W.D.N.Y. Apr. 2, 2007) (finding that defendant did not have a privacy interest in cell phone number that was not registered or used by the defendant).

The Government maintains that it is unknown which individual had a property interest in the target telephone (239-222-5448) that was tracked in order to locate Sereme for the December 20, 2010 traffic stop. The Government points out that on both occasions when the target telephone was geographically located by law enforcement pursuant to the Court's order (the Wal-Mart on or about December 10, 2010 and on December 20, 2010) the Defendant was in the company of another individual.

The Court has reviewed the evidence and testimony in this case and notes that the Government obtained the GPS Tracking Order for the target telephone with the intent of tracking Defendant Sereme specifically. In fact, Spec. Agt. Davis testified that the purpose of obtaining the Order was to track the movements of Sereme. (Tr. 29:25-30:6). No other individual besides Sereme was mentioned in the Application or the Order. In the Application for an Order Authorizing the Installation and Use of Both a Pen Register with Enhanced Caller Identification and a Trap and Trace Device, it states that "the information likely to be obtained is relevant to an ongoing investigation of a subject known as Jude Sereme by the Lee County Sheriff's Office for the offense of Trafficking in Cocaine." (Def. Ex. A). The Order that was issued by Judge Mark Steinbeck was titled "IN RE: Jude Sereme Investigation" and states that the application "alleged that Jude Sereme is a subject of an ongoing criminal investigation, in possession of cellular telephone number (239-222-5448) Lee County, Florida." (Def. Ex. A at pg. 1). Further, Defendant has established that his calls were intercepted. (Tr. 58:15-21). Given that the intercept order was directed at a telephone number that was asserted to be that of Defendant

Sereme, the Court recommends that he is an "aggrieved person" as set forth in the statute and therefore has standing to challenge the information obtained from the tracking of the target telephone.

### B. Whether an Unlawful Search Occurred

With regard to the merits, the Defendant argues that the interception of his movements by the use of a GPS device constituted a warrantless search in violation of the Fourth Amendment and therefore any items of evidence found at the traffic stop must be suppressed. Here, the Government had obtained an order from a state court judge which instructed Sprint to provide the location of the cell phone in question at any time for a period of sixty days. There was no device physically placed on the vehicle by law enforcement. Rather, the monitoring was only done through the cellular telephone. This distinction is important as the Supreme Court recently held in United States v. Jones, that the Government's installation of a GPS tracking device on a vehicle and its use of that device to monitor the vehicle's movements without a valid warrant was a search in violation of Jones' rights. United States v. Jones, 132 S. Ct. 945 (2012). Sereme relies on Jones, contending that the GPS evidence should be suppressed as five members of the Court in a concurring opinion authored by Justice Alito, expressed the view that *long-term* GPS monitoring of an individual by law enforcement impinges on expectations of privacy, without regard to the specific technology employed. Id. at 954, 964. "But the use of longer term GPS monitoring in investigations of most offenses impinges on expectations of privacy. For such offenses, society's expectation has been that law enforcement agents and others would not—and indeed, in the main, simply could not—secretly monitor and catalogue every single movement of an individual's car, for a very long period." Id. at 964. The concurring opinion was not limited to the attachment of physical devices to monitor movements.

In this case, there was no physical trespass onto Sereme's property. There was no physical device attached to the car in which he was a passenger or any other piece of his property. Based upon this Court's reading, the <u>Jones</u> opinion does nothing to preclude the Government's monitoring of individuals through the use of cell site technology. As the opinion stated, it resolved only "whether the attachment of a Global-Positioning-System (GPS) tracking device to an individual's vehicle, and subsequent use of that device to monitor the vehicle's movements on public streets, constitutes a search or seizure within the meaning of the Fourth Amendment." <u>Jones</u>, 132 S. Ct. at 948. The Supreme Court has not answered the broader question presented here which is whether the Government's monitoring of an individual's movements through their cell phone for a certain period of time constitutes a "search" within the meaning of the Fourth Amendment, and more importantly whether that "search" requires a warrant issued upon probable cause of some other level of suspicion, such as the traditional reasonable suspicion.

In this case, law enforcement monitored and tracked the movements of the target telephone that was believed to be used by Sereme for a period of 12 days after law enforcement had received an Order allowing them to do so in accordance with Fla. Stat. § 934.32. Thus, the initial stop of the vehicle was not unlawful on these grounds.

## II.     <u>The December 20, 2010 Traffic Stop</u>

Defendant challenges what he classifies as a "strip search" at the side of the road during the traffic stop as well as his detention. On December 20, 2010, as the target telephone was traveling in a motor vehicle, the cell site information became limited as the location was updated every fifteen and then every five minutes. Law enforcement knew that the target telephone was traveling in a vehicle from Miami, Florida towards the Fort Myers, Florida area, but were

unaware of the exact location of the target telephone. As a result, Spec. Agt. Davis decided to have law enforcement patrol the roads that lead to the Linda Loma subdivision as law enforcement was aware based on previous surveillance that Defendant Sereme had been seen in this area and it was suspected that Defendants were trafficking drugs out of this area. With the suspicion that the target telephone would be located in the silver Ford Edge, such information was relayed to Lt. Pete Hedrick and Detective Steven Kirkby. Lt. Hedrick was able to locate the suspect vehicle and began to follow it for approximately one mile and a half from Gladiolus to Bass Road. Lt. Hedrick observed the front driver side and passenger windows of the vehicle to have illegal tint, as he was unable to see the occupants or the front dashboard lights. (Tr. 66:3-5). Lt. Hedrick paced the vehicle and determined that it was also speeding. As a result, Lt. Hedrick conducted a traffic stop of the vehicle.

Upon the vehicle being stopped, Lt. Hedrick made contact with the driver of the vehicle, Johnny Pierre (Pierre). Lt. Hedrick immediately smelled the strong odor of marijuana emanating from the vehicle. Lt. Hedrick had Pierre step out of the vehicle and they both went to the rear of the vehicle. Pierre admitted to speeding based on his son having to use the restroom. LCSO Det. Kirkby also arrived within a couple of minutes and made contact with the front seat passenger, Sereme. A minor was also seated in the back of the vehicle. Det. Kirkby had a video camera in his flashlight which he turned on when he asked Sereme for the rental documents. The video was provided to the Court and portions were played during the hearing. (Govt. Ex. 2). Det. Kirkby could also smell a strong odor of marijuana emanating from the vehicle. Det. Kirkby spoke with Sereme and asked him to provide the rental agreement. The Defendant provided the agreement.

Det. Kirkby then spoke with Pierre about the rental vehicle and Pierre admitted that he had tinted the windows himself because he did not want the sun coming in the vehicle. (Govt. Ex. 2, at 7:41). Pierre admitted that they had been smoking marijuana and stated "we had smoked a blunt" and indicated that the officer "might see two little buds" in a cup in the center console that he has used as an ashtray. (Govt. Ex. 2, at 7:27, 9:40). Lt. Hedrick then asked Pierre if he could check the vehicle and Pierre agreed. During the contact with Pierre, Lt. Hedrick did a cursory pat down of Pierre and no weapons or contraband was found. At that point, Sereme and the minor joined Det. Kirkby while Lt. Hedrick conducted a search of the interior of the vehicle. Lt. Hedrick also did a cursory pat down of Sereme before beginning to search the vehicle. He did not locate any weapons. Det. Kirkby testified that he could smell the odor of marijuana coming from Sereme's person as they spoke about different topics while Lt. Hedrick was searching the vehicle. Lt. Hedrick searched the vehicle for approximately 27 minutes and located marijuana residue, or "shake marijuana" in the front passenger compartment, but no other contraband. Upon the arrival of an additional law enforcement officer, Det. Kirkby made contact at the vehicle with Lt. Hedrick who was still searching the vehicle. The Court, in listening to the video could hear Det. Kirkby note that there is a strong odor of marijuana coming from the vehicle in certain parts of the vehicle. But the officers found no marijuana in the vehicle even though Pierre had stated that there were two "buds" of marijuana in a cup in the console and the odor in the vehicle was strong. The officers then discussed their observation that neither Pierre nor Sereme had been intently watching the search as might be expected if there was contraband in the vehicle. Det. Kirkby then asked Lt. Hedrick if he had "any ideas." Det. Kirkby then says "alright, I'll check him again," apparently referring to Sereme. (Govt. Ex. 2, at 33:40).

Det. Kirkby then walked away from the vehicle and made contact with Sereme. Det. Kirkby asked Sereme if he had anything on him and Sereme answered in the negative. While the Government asserts in its brief that Det. Kirkby, standing next to Sereme, tapped on the surface of the patrol vehicle and Sereme assumed a search position (Doc. #144, p. 4), at the hearing Det. Kirkby testified that the video shows him positioning his flashlight that was about to roll off the car and did not tap the surface of the vehicle. (Tr. 127:9-15). The Government also asserts in its Brief that this position was assumed by Sereme without any direction by Det. Kirkby, which Det. Kirkby testified to. (Tr. 128:10-15). Defendant also contended at the hearing that Sereme was directed by Det. Kirkby to come over to the patrol car with him so that he could search him, even though the transcript shows – and Det. Kirkby testified that – this was a question, rather than a command. Det. Kirkby conceded on cross-examination that he asked Sereme to come to the patrol car with the understanding that if he did not do it, Det. Kirkby would have made him. (Tr. 130:11-24). Det. Kirkby then conducted an exterior tactile search of Sereme. The search was shielded from the road by the officers' vehicles on one side and a berm of trees on the other. Det. Kirkby also took care to conduct the search in a way as to not expose the minor child to the search. Because Sereme was very heavy set and his pants were tight, Det. Kirkby manipulated them in order to conduct a more thorough search. Det. Kirkby was able to feel something poking out of Sereme's underwear. Det. Kirkby then asked Sereme to turn around and unbutton his pants because they were too tight and a proper search could not be conducted. Det. Kirkby had Sereme move his pants lower which exposed his underwear. Det. Kirkby testified that he could then see some white powder falling out between the Defendant's legs. After checking between Sereme's upper thigh area, Det. Kirkby then checked Sereme's buttocks area from the exterior. Neither Sereme's genitalia nor his buttocks were exposed to Det. Kirkby until he pulled

Sereme's underwear back, revealing Sereme's buttocks only to Det. Kirkby, and observed suspect cocaine in Sereme's buttocks. Sereme was then placed in handcuffs away from the view of the minor and read his rights and asked if he wanted to speak with an attorney. After putting on gloves, Det. Kirkby recovered three tied off baggies containing presumptive cocaine. (Tr. 95:12-25).

There is no contention that the initial stop of the vehicle for illegal tint and speeding was unlawful.[1] In any event, the Court recommends that Lt. Hedrick had probable cause to conduct a traffic stop of the subject vehicle because he observed it had illegal tint *prior to the time he made the stop*, which was later confirmed by him through testing. Florida law allows an officer to stop a vehicle in instances where the officer believes the vehicle's window tinting is too dark. State v. Moore, 791 So. 2d 1246 (Fla. 1st DCA 2001). *See* United States v. Weaver, 145 Fed. Appx. 639, 641 (11th Cir. 2005) (*citing* Fla. Stat. § 316.2953, holding that a traffic stop was supported by probable cause where the officer believed the vehicle's window tinting was in violation of Florida's legal limits). He also observed that the subject vehicle was speeding prior to the stop. Lt. Hedrick paced the vehicle, which Lt. Hedrick had testified he had done thousands of times in his 19 years as a police officer. (Tr. 66:12-17). The Fourth Amendment permits an officer to stop a vehicle where there is probable cause to believe that a traffic violation has occurred. United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999). Further, the driver of the vehicle corroborated the fact that he was speeding prior to the stop and that he had tinted the windows himself on the rental vehicle.

Sereme contends that the strip search of his person violated the Fourth Amendment. Specifically, the Defendant argues that there was no justification for the highly intrusive search

---

[1] The Defendant does contend, as discussed above, that the initial stop of the vehicle was unlawful because the vehicle was located using GPS tracking of Sereme in violation the Fourth Amendment.

as the first pat down of Sereme when he was taken out of the vehicle revealed no contraband or weapons and no contraband was found in the vehicle;[2] therefore the officers had no probable cause to return and search Sereme a second time.  Sereme also contends that the detention was unlawful as it was for an unlawful duration.

### A.  The Search of Sereme's Person

The Court starts with the observation that what occurred in this case was likely not a strip search as is understood in the context of Fourth Amendment strip search cases.  In this case, Det. Kirkby testified that Sereme is a large individual and the pants that he was wearing were tight.  Therefore, Det. Kirkby testified that on an initial, exterior search of the Defendant he could feel something protruding out of his buttocks area.  (Tr. 92:7-14).  Thus, Det. Kirkby had him unbutton his pants in order to feel around his waist.  He then had him lower his pants just enough to reveal his underwear and he then saw white powder falling down between his legs.  (Tr. 93:23-94:6).  At that point he had even more cause for suspicion, or even confirmation in light of the fact that Sereme was known to be a drug dealer of cocaine, that Sereme was transporting narcotics.  Det. Kirkby then had him turn around, he pulled out the waist of his underwear to reveal his buttocks, and then saw the baggie.  Sereme was never asked to remove all of this clothing and he only briefly had his underwear pulled back *after* Det. Kirkby had seen white powder falling between his legs.  Sereme never removed any of his clothing and the search was conducted quickly and discretely.

---

[2] It is not clear if Sereme is challenging the initial patdown that Lt. Hedrick conducted on him when he was taken out of the vehicle.  In any event, the Court recommends that the officer was well within the purview of what is allowed under Fourth Amendment jurisprudence to conduct the initial patdown, which he testified was for officer safety.  (Tr. 73:4-13).  It is well established that officers conducting a traffic stop may "take such steps as [are] reasonably necessary to protect their personal safety." United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001) (citing United States v. Hensley, 469 U.S. 221, 235, 105 S. Ct. 675, 83 L. Ed.2d 604 (1985)). This includes conducting a protective search of the driver, Pennsylvania v. Mimms, 434 U.S. 106, 111, 112, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977), the passengers, id., and the vehicle, Michigan v. Long, 463 U.S. 1032, 1049-51, 103 S. Ct. 3469, 77 L. Ed.2d 1201 (1983).

"An exception to the probable cause requirement exists for investigatory detentions whereby 'minimally intrusive searches and seizures of the person are permissible when a law enforcement officer has an objectively reasonable suspicion that criminal activity may be afoot.'" United States v. Smith, 318 Fed. Appx. 780, *11 (11th Cir. 2009) (quoting United States v. Heard, 367 F.3d 1275, 1278 (11th Cir. 2004)). Reasonable suspicion "can arise from information that is less reliable than that required to show probable cause." Id. (quoting Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416, 110 L.Ed.2d 301 (1990)). "Nevertheless, it must derive from 'something more than an inchoate and unparticularized suspicion or hunch.'" Id. (quoting United States v. Dunn, 345 F.3d 1285, 1289 (11th Cir. 2003).

Based on the facts of this case the Court recommends that there was an "investigatory detention" of Sereme at the scene. During the time that Sereme was detained the officers were conducting the search of the vehicle that was consented to by the driver. Given the circumstances at the scene, the officers at a minimum had reasonable suspicion to search Sereme in light of the totality of the circumstances observed and sensed by Lt. Hedrick and Det. Kirkby. The facts are that the officers smelled a strong odor emanating from the vehicle and from Sereme's person and the driver had told the officers that there were probably a couple of buds of marijuana in the vehicle but the officers had not discovered any contraband during their search. Defendant Sereme had been left in the vehicle for at least two minutes while Lt. Hedrick was the only officer at the scene and he was back at his patrol car speaking to Pierre. (Tr. 70:2-3). Therefore, Sereme was left alone in the vehicle for a certain amount of time alone with the buds of marijuana that Pierre told them was probably in the vehicle and it was no longer there upon the search. Pierre also informed the officers that both he and Sereme had smoked a blunt. (Govt. Ex. 2, at 7:27). Further, the rental vehicle occupied by Sereme had tint added to the

windows, was traveling from a source city of narcotics, namely Miami headed towards the Linda Loma neighborhood, an area which law enforcement suspected of drug trafficking. Therefore, it was reasonable based on the totality of the circumstances for the officers to believe that criminal activity was afoot and for the officers to search Sereme[3] in order to find the marijuana.[4] The search was conducted in a reasonable manner as the scope of the intrusion was limited to what was necessary to check what Det. Kirkby felt in Sereme's buttocks area.

## B. Detention

The Defendant argues that once the purposes of the initial traffic stop are completed, an officer cannot further detain the vehicle or its occupants unless something that happened during the traffic stop generated the necessary reasonable suspicion to justify further detention. See United States v. Holloman, 113 F.3d 192, 195 (11th Cir. 1997) (citing United States v. Mesa, 62

---

[3] The Government also argues that the second search of Sereme was a consent search. The Court recommends that this is not supported by Det. Kirkby's testimony, or the video of the incident. Det. Kirkby testified that even though he asked the Defendant to come to the patrol car with him, he asked with the understanding that if the Defendant did not do so, the Detective would make him. (Tr. 126:8-126:22). As the video shows, Sereme did not give any verbal consent to Det. Kirkby to search him, but merely did everything that Det. Kirkby told him to do. Therefore, the Court recommends that Sereme was not acting under his own free will during this encounter and was not free to choose whether to act or not. In assessing voluntariness, the inquiry is factual and depends on the totality of the circumstances. United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001). In order for consent to be deemed voluntary, it must be the product of an essentially free and unconstrained choice. United States v. Garcia, 890 F. 2d 355, 360 (11th Cir. 1989).

[4] To the extent that this was not considered an investigatory detention which requires reasonable suspicion, the officers still would have had probable cause to search Sereme. "The Fourth Amendment provides that seizures and searches of persons must be justified by probable cause." United States v. Hundell, 322 Fed. Appx. 772, *1 (11th Cir. 2009). Probable cause for a search exists when under the totality of the circumstances "there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Goddard, 312 F.3d 1360, 1363 (11th Cir. 2002). "Probable cause 'requires more than suspicion,' but not 'convincing proof, and need not reach the same standard of conclusiveness and probability as the facts necessary to support a conviction.'" United States v. Warren, 2012 WL 613532, *2 (11th Cir. Feb. 28, 2012) (quoting United States v. Dunn, 345 F.3d 1285, 1290 (11th Cir. 2003)). "Presence alone is not sufficient to constitute probable cause, but 'presence and additional factors that would lead a prudent person to believe that an offense has been or is being committed is sufficient.'" Id. at *3 (quoting United States v. Irurzun, 631 F.2d 60, 63 (5th Cir. 1980)). "Because behavior may seem innocent to the untrained eye, courts must also consider the officer's observations and experience." Id. (citing United States v. Gonzalez, 969 F.2d 999, 1003-04 (11th Cir.1992)). "Observations and other information supplied by officers involved in a common investigation can, taken together, create probable cause for a search." Goddard, 312 F.3d 1363. Therefore, the Court recommends that based on the facts and circumstances discussed above, the officers had probable cause to search Sereme and therefore no Fourth Amendment violation occurred.

F.3d 159, 162 (6th Cir. 1995)). Defendant argued at the hearing that he was detained and not free to leave, and was acting under the control of the officers. Defendant argues that the strip search of Sereme, which ultimately revealed the cocaine, occurred well after he should have been permitted to leave.

With regard to the length of investigatory detention, the Court recommends that it was a lawful amount of time in this case. While a traffic stop must be of a limited duration related to the circumstances leading to the stop, "articulable suspicion of other illegal activity" can result in the prolonging of such a stop. United States v. Frazier, 194 Fed. Appx 694, 700 (11th Cir. 2006) (quoting United States v. Purcell, 236 F.3d 1274, 1277 (11th Cir. 2001)). A police officer can question a driver about the infractions that were the basis of the stop, request consent to a search of the car, and run other common database checks. United States v. Harris, 928 F.2d 1113, 1117 (11th Cir. 1991) (citing United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) and Purcell, 236 F.3d at 1278)). The smell of marijuana coming from a lawfully stopped vehicle is sufficient to alert law enforcement of criminal activity and justify further detention of the vehicle and its occupants. See Bryan v. Spillman, 217 Fed. Appx. 882, 885 (11th Cir. 2007) (citing United States v. Garcia, 592 F.2d at 259 (5th Cir. 1979) (holding that smell of marijuana emanating from a vehicle established reasonable suspicion justifying search)).

In this case, Sereme was detained for a reasonable amount of time for the officers to conduct a lawful search of the vehicle which was consented to after the driver had admitted to smoking marijuana and had told the officers that there was marijuana still in the vehicle. Based on the illegal activity that the driver had admitted to, as well as the strong odor emanating from the vehicle, further detention was warranted.

### III.    Intercepted Communications

Defendant also seeks to suppress all of the conversations intercepted pursuant to the Title III wiretaps, arguing that the Title III intercept affidavits incorporated the results of the unlawful search of the Defendant on December 20, 2010, and his jail conversations.[5]  Defendant argues that the December 20, 2010 stop, which was unlawful, was a substantial part of the applications for the wiretaps to be issued; therefore the wiretaps should be suppressed as a fruit of the poisonous tree.

On July 12, 2011, some seven months after Sereme was incarcerated, in continuance of the investigation into the Haitian MOB, Spec. Agt. Davis obtained authorization from the Honorable John E. Steele to intercept the electronic and wire communications occurring over cellular telephone number 239-384-1052, a phone believed to be used by defendant Rick Jean. In summary, the affidavit in support of the application (Def. Ex. D – application and order) for authorization to intercept the wire and electronic communications contained background information provided by three confidential informants, surreptitiously recorded conversations between a confidential informant and Rick Jean, descriptions of physical surveillance, historical drug activity of Sereme and others, as well as their criminal history.  The affidavit did reference the traffic stop of the Defendant on December 20, 2010, which resulted in the seizure of cocaine, and the subsequent jail calls between the Defendant and other individuals.  Wire and electronic communications of Sereme and others were obtained during the authorized periods.

On August 12, 2011, Spec. Agt. Davis obtained authorization from the Honorable John E. Steele to intercept the continuing wire communications occurring over cellular telephone number

---

[5] The Motion seeks suppression of the Title III intercepted conversations based on Sereme's contention that the intercept orders are the "fruit of the poisonous tree" following the unlawful December 20, 2010 traffic stop and search of Sereme's person.  This is not a motion to suppress based upon the failure to comply with the requirements of Title III in obtaining the wiretaps.  This is the issue raised by Co-Defendant Neheme Ductant in his Motion to Suppress Wiretap Evidence, which Sereme moved to adopt.  (Docs. #118, 153).

239-384-1052, a phone believed to be used by Co-Defendant Rick Jean, and 754-244-3916, a phone believed to be used by Co-Defendant Neheme Ductant. In summary, the probable cause in support of the application for authorization to intercept the wire and electronic communications (Def. Ex. E – application and order) contained information provided by three confidential informants, intercepted wire and electronic communications occurring over 239-384-1052, descriptions of physical surveillance, historical drug activity of the Defendant and others and their criminal history. The affidavit did reference the traffic stop of the Defendant on December 20, 2010, which resulted in the seizure of cocaine, and the subsequent jail calls between the Defendant and other individuals. Wire communications of Sereme and others were obtained during the authorized period.

Defendant argues that the recorded conversations while Sereme was incarcerated as a result of the unlawful December 20, 2010 search, as well as conversations that were recorded as a result of the Title III intercept orders, should be suppressed as "fruit of the poisonous tree" as the intercept orders include as the basis for the orders the unlawful search of December 20, 2010, as well as the conversations recorded from the jail. Therefore, Defendant moves to suppress both.[6]

When determining whether evidence is "fruit of the poisonous tree" and therefore must be excluded, the relevant question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality

---

[6] Defendant also raised for the first time at the hearing on the Motion to Suppress that he is moving to suppress the voice identification of Sereme made by the agents based on the jail phone calls he made under the fruit of the poisonous tree doctrine; specifically that there was no other independent source for the agents to know Sereme's voice other than the jail phone calls which only occurred because Sereme was arrested after the unlawful traffic stop. (Tr. 159:18-160:20). The Court recommends that this argument fails as the Court has recommended that the traffic stop was lawful and therefore the interception of Sereme's jail calls would not be the fruit of the poisonous tree.

or instead by means sufficiently distinguishable to be purged of the primary taint." <u>United States v. Delancy</u>, 502 F.3d 1297, 1309 (11th Cir. 2007).

With regard to the recorded jail conversations, the Court notes as discussed above that the search of Sereme's person which revealed cocaine was lawful and therefore his arrest and incarceration was lawful. Thus, any recordings in the jail would not have been the fruit of any poisonous tree.

With regard to the Title III wiretap orders, the Government argues that even if the Court were to excise the paragraphs of the affidavits relating to the December 20, 2010 incident from consideration for determination of probable cause, there was additional probable cause for the Court to grant authorization to intercept the communications occurring over cellular telephone numbers 239-384-1052 and 754-244-3916.[7]

An application for a wiretap must be supported by the same probable cause for a search warrant. <u>United States v. Nixon</u>, 918 F.2d 895, 900 (11th Cir. 1990). The probable cause determination is a "practical, common-sense decision" about whether the "totality of the circumstances" indicate that there is probable cause that the sought-for evidence will be obtained. <u>Id.</u> The information in support of probable cause should be sufficient enough that a determination can be made that the telephone number is being used in furtherance of unlawful activity. <u>United States v. Domme</u>, 753 F.2d 950, 954, FN 2, (11th Cir. 1985) (citing <u>United States v. Tehfe</u>, 722 F.2d 1114, 1118 (3rd Cir. 1983)). "A wiretap application need not provide probable cause of criminal activity for each person named in an application . . . ." <u>Domme</u>, 753 F.2d at 954, n.2 (citing <u>United States v. Martin</u>, 599 F.2d 880, 884-85 (9th Cir. 1979)).

---

[7] No communications were intercepted pursuant to the authorization to intercept communications of cellular telephone number 239-321-1233, relating to Defense Exhibit #3, admitted in support of Neheme Ductant's Motion to Suppress Wiretap Evidence, therefore there is no basis for exclusion of any evidence derived from this wiretap order as no communications were intercepted and it is not at issue in the instant Motion.

"In probable cause determinations, a totality of the circumstances analysis applies, and '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Holt, 408 Fed. Appx. 229, *4 (11th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

The Court has reviewed the affidavits and notes that the affidavit in support of interception of communications occurring on cellular phone number (239) 384-1052 (Def. Ex. D) includes paragraphs 20, 21, 22, 29, and 29A, which discuss the December 20, 2010 incident and jail calls. But other than this information, it also contains background information provided by three separate confidential informants. (Def. Ex. D, pp. 13-24). The background information discusses the involvement of Sereme and others in drug distribution activity in Lee County, Florida and elsewhere. In the "Probable Cause for Target Telephone" section, the affidavit discusses recorded conversations between CS-3 and Defendant Rick Jean, who was using cellular telephone number (239) 384-1052. Id. at 25-28. These recorded conversations took place between May and July 2011, and alone establish probable cause that cellular telephone number (239) 384-1052 was being used in unlawful activity. As described, these conversations were of a criminal nature and involved the distribution of cocaine base. With the exception of paragraph 29A, none of these conversations were the jail conversations sought to be suppressed by Sereme. Based on the totality of the circumstances described in the affidavit, even with the exclusion of the information regarding the December 20, 2010 traffic stop, as well as the jail calls, the Court recommends that there was independent probable cause for the Court to

determine that cellular telephone number (239) 384-1052 was being used in unlawful activity; therefore the order was issued upon probable cause and suppression is not warranted.

With regard to the affidavit in support of the continuing interception of communications on cellular telephone number (239) 384-1052 and for the interception of (754) 244-3916, a review of the affidavit (Def. Ex. E) also reveals inclusion of the information related to the December 20, 2010 traffic stop and subsequent jail calls at paragraphs 21, 22, and 23. Similar to the discussion above, even if these paragraphs were excised from the affidavit, there was independent probable cause for the authorization by Judge Steele.

The affidavit contains background information provided by three separate confidential sources. (Def. Ex. E, pp. 17-28). The background information discusses the involvement of Sereme and others in drug distribution activity in Lee County, Florida and elsewhere. In the "Intercepted Communications involving Target Telephone 1 and/or Target Telephone 2" section, the affidavit discusses recorded conversations of a criminal nature between cellular telephone numbers (239) 384-1052 and (754) 244-3916. Id. at 28-40. These were intercepted communications occurring over cellular telephone number (239) 384-1052, pursuant to the Court's Order authorizing such interception. These communications establish probable cause that cellular telephone numbers (239) 384-1052 and (754) 244-3916 were being used in unlawful activity. As described, these conversations were of a criminal nature and involved the distribution of cocaine base. None of these conversations were the jail conversations sought to be suppressed by Sereme. Therefore, there was independent probable cause for the Court to determine that cellular telephone numbers (239) 384-1052 and (754) 244-3916 were being used in unlawful activity and suppression is not warranted.

**IV.**     **Jophaney Hyppolite's Motion to Adopt Sereme's Motion to Suppress Evidence**

Co-Defendant Jophaney Hyppolite moves to adopt Sereme's Motion to Suppress Evidence. Hyppolite fails to allege standing in his Motion to Adopt. It is well established that in order for a defendant to move to suppress evidence, he must have standing. United States v. Eyster, 948 F.2d 1196, 1208-09 (11th Cir. 1991). A defendant has the burden of showing standing under the Fourth Amendment standard. United States v. Brazel, 102 F.3d 1120, 1147 (11th Cir. 1997). To claim the protection of the Fourth Amendment, an individual must have a "reasonable expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). A defendant's expectation must be "personal[ ]" and "reasonable," and it must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (citations and internal quotations omitted). "Standing does not require an ownership interest in the invaded area." United States v. Hernandez, 647 F.3d 216, 219 (5th Cir. 2011) (noting that the Supreme Court has recognized that an overnight guest in a home has a legitimate expectation of privacy in that home).

As stated on the record at the hearing, the Court recommends that Hyppolite has not shown that he has standing to move to suppress the evidence obtained from the December 20, 2010 traffic stop, nor the Title III wiretaps because he was not a passenger in the vehicle on December 20, 2010, nor has he shown that his conversations were intercepted as a result of the wiretaps.

Accordingly, it is now

**RECOMMENDED:**

(1) Defendant Jude Sereme's Motion to Suppress Evidence and Memorandum of Law (Doc. #120) be **DENIED**.

(2) Jophaney Hyppolite's Motion to Adopt Sereme's Motion to Suppress Evidence (Doc. #127) be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this 26th day of March, 2012.

SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

**Copies**:  All Parties of Record