UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

VS.                                            CASE NO: 2:11-CR-97-FtM-UASPC

NEHEME DUCTANT,
JUDE SEREME,
JOPHANEY HYPPOLITE,
RICK JEAN,
WILMANE JEAN,
RASHID FRANCOIS,
and ERIC BONITA

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on Neheme Ductant's Motion to Suppress Wiretap Evidence (Doc. #118) filed on February 8, 2012. United States' Omnibus Response and Motion to Strike Defendant Ductant's Motion to Suppress Wiretap Evidence and Incorporated Memorandum of Law (Doc. #141) was filed on February 17, 2012. Neheme Ductant's Reply to Government's Response and Motion to Strike Defendant's Motion to Suppress Wiretap Evidence (Doc. #142) was filed on February 18, 2012. Ductant was directed to file a supplemental memorandum in support of his motion to suppress wiretap evidence, and he did so on March 5, 2012. (Doc. #153). In his Supplemental Memorandum, Ductant narrowed the grounds for suppression previously raised in his original Motion. Defendants Sereme, Hyppolite, R. Jean, W. Jean, and Francois, all moved to adopt Ductant's original Motion to Suppress Wiretap Evidence (Docs. #126, 128, 134, 136, and 146). All of these Defendants with

1

the addition of Bonita moved to adopt Ductant's Supplemental Memorandum, which narrowed the grounds for suppression. (Docs. #161, 164, 162, 163, 165, and 166).

The Court held a hearing on the Motions on March 8, 2012, during which time the Court heard testimony on the Motion and argument from counsel for both parties. Defendant Jude Sereme was present and represented by Assistant Federal Public Defender, Russell Rosenthal; Defendant Jophany Hyppolite was present and represented by counsel, John Mills; Defendant Rick Jean was present and represented by counsel Landon Miller; Defendant Rashid Francois was present and represented by counsel Jose Calvo; Defendant Wilmane Jean was present and represented by counsel Anthony Borras; Defendant Eric Bonita was present and represented by counsel Richard Lakeman. The Government was represented by Assistant United States Attorney, Jesus Casas.

## BACKGROUND

A joint Florida Department of Law Enforcement and Federal Bureau of Investigation task force conducted an ongoing investigation into the drug trafficking operation ("DTO") of the Haitian MOB, an organization which traffics illegal narcotics from Miami, Florida to the Ft. Myers, Florida area. As part of this investigation, agents and officers have employed various investigative techniques, including the use of confidential informants as well as cell site location technology to trace the cellular telephones of members of the DTO.

Based on this investigation, on September 28, 2011, Defendant Ductant and nine co-defendants were indicted by a Grand Jury and are charged in Count I with conspiracy to possess with intent to distribute cocaine base from an unknown date, but at least by July 2010 through September 28, 2011. Count II charges Defendant Ductant with distributing a quantity of crack cocaine.

On July 12, 2011, in continuance of the investigation into the Haitian MOB, Special Agent Davis (Spec. Agt. Davis) obtained authorization from the Honorable John E. Steele to intercept the electronic and wire communications occurring over cellular telephone number 239-384-1052 (Target Telephone #1), a phone believed to be used by defendant Rick Jean. In summary, the affidavit in support of the application (Def. Ex. 1 – application and order) for authorization to intercept the wire and electronic communications contained background information provided by three confidential informants, surreptitiously recorded conversations between a confidential informant and Rick Jean, descriptions of physical surveillance, historical drug activity of Sereme and others, as well as their criminal history. Wire and electronic communications were obtained during the authorized periods.

On August 12, 2011, Spec Agt. Davis obtained authorization from the Honorable John E. Steele to intercept the continuing wire communications occurring over cellular telephone number 239-384-1052, a phone believed to be used by Co-Defendant Rick Jean, and 754-244-3916 (Target Telephone #2), a phone believed to be used by Defendant Neheme Ductant. In summary, the probable cause in support of the application for authorization to intercept the wire and electronic communications (Def. Ex. 2 – application and order) contained information provided by three confidential informants, intercepted wire and electronic communications occurring over 239-384-1052, descriptions of physical surveillance, historical drug activity of the Defendant and others and their criminal history. Wire communications were obtained during the authorized period.

On September 19, 2011, the Government submitted an application for an initial intercept of 239-321-1233 (Target Telephone #3), but no communications were intercepted from this phone line. (Def. Ex. 3).[1]

In the Affidavits supporting the wiretap applications, one of the Government's allegations was that it had received information that Ductant and others were engaged in drug distribution from various houses in the Ft. Myers, Florida area. Based upon these applications, the Honorable John E. Steele signed and issued Title III wiretap intercept orders for the three telephone lines. (Def. Exhs. 1-3). Pursuant to these orders, communications were intercepted between Ductant and others who are indicted in this case. It is the evidence of these interceptions, and any evidence derived therefrom, which Ductant requests that the Court suppress.

## TESTIMONY

*Special Agent Ryan Davis (Tr. 22:16-84:10)*

Ryan Davis is a special agent with the FBI in Fort Myers, Florida since April 2010. (Tr. 22:18-25). Prior to that – from 2001-2010 – he was a police officer in Youngstown, Ohio. (Tr. 22:25-23:2). Spec. Agt. Davis was the affiant for an application for authorization to intercept wire and electronic communications for Target Telephones #1, 2, and 3, but no communications were intercepted for Target Telephone #3 because the account had been cancelled. (Tr. 23:11-24:6).

Spec. Agt. Davis testified that in the affidavit for both Target Telephone #1 and 2, he described the use of two confidential sources that were assisting in the investigation. (Tr. 24:18-

---

[1] No communications were intercepted pursuant to the authorization to intercept communications of cellular telephone number 239-321-1233, relating to Defense Exhibit #3, therefore there is no basis for exclusion of any evidence derived from this wiretap order as no communications were intercepted and it is not at issue in the instant Motion.

4

25).  He stated that Confidential Source 1 (CS-1) provided a lot of historical information about the DTO's distribution of narcotics, specifically in the North Fort Myers, Florida area.  CS-1 interacted with some of the organization members, but it was strictly on a street level narcotics purchasing relationship.  (Tr. 24:24-25:4).  CS-1 was not able to purchase crack cocaine from any of the subjects of the investigation that were ultimately indicted.  (Tr. 25:5-10).  CS-1 also did not have any personal knowledge of the inner workings of the DTO.  (Tr. 25:11-15).

Confidential Source 2 (CS-2) provided mostly historical information to Spec. Agt. Davis and some current intelligence during the investigation, but the majority of what he provided was historical.  (Tr. 25:16-23).  CS-2 was able to provide telephone numbers and was capable of engaging both Defendant Sereme and others in conversation.  (Tr. 25:24-26:4).  CS-2 was never able to purchase cocaine base from any of the sources that were ultimately indicted.  (Tr. 26:5-8).  Spec. Agt. Davis testified that CS-2 had been arrested while working within the DTO and after the source's release from jail he was not trusted by members of the organization.  (Tr. 26:9-15).

Confidential Source 3 (CS-3) provided a little historical information, but for the most part was providing current intelligence on drug distribution by the DTO within the Linda Loma subdivision near Fort Myers Beach.  (Tr. 26:16-22).  CS-3 was able to purchase street-level quantities of cocaine base.  (Tr. 26:23-25).  But he had no personal knowledge of the inner workings of the organization.  (Tr. 27:7-3).

Through the course of the investigation, CS-1 provided Spec. Agt. Davis with a telephone number that was the basis of an application for interception of Target Telephone #1, which was being utilized by Defendant Rick Jean.  (Tr. 27:4-12).  Prior to the time that the Court allowed the interception of Target Telephone #1, Spec. Agt. Davis was unable to discern the manner in which members of the organization worked together.  (Tr. 27:16-21).  And he was aware of some

of the possible locations of distribution houses, but not all of them. (Tr. 27:22-24). Prior to the interception order, the members of the DTO frequently changed their distribution houses, especially after any law enforcement actions were taken at those houses. (Tr. 27:25-28:5). He was unaware of who the source of supply was for the cocaine base. (Tr. 28:13-15). He also did not have any information as to how the proceeds of drug distribution were divided or how shipments of cocaine or cocaine base were made. (Tr. 28:16-21). Spec. Agt. Davis also testified that he did not have any knowledge as to how drug proceeds were transported. (Tr. 28:24-29:4).

Prior to the time that Spec. Agt. Davis applied for the wiretap order, he testified that there were limitations on cell site location tracking as it only gave you where the actual phone was located. It did not say who was in possession of it or near it. It also had limitations when it came to live tracking of the phone while it was moving. (Tr. 29:5-18). There were also limitations on physical surveillance as it did not show who was meeting inside the houses, or what was being discussed. (Tr. 30:6-14). The pole cameras likewise did not show what was going on inside any of the distribution houses, but did show suspected crack cocaine customers coming and going from locations. (Tr. 30:15-21). Undercover detectives were also utilized in the investigation and they were initially successful in purchasing drugs, but this course of investigation was aborted because it became dangerous. (Tr. 30:22-31:9). In one incident, an undercover detective was strip searched prior to being sold cocaine base. Spec. Agt. Davis was also informed by a confidential source that the only way an undercover detective would be allowed to purchase directly from one of the organization members was if they smoked crack cocaine in front of the distributor. (Tr. 31:31:7-16)

The probable cause outlined in the affidavit for Target Telephone #1 included conversations between CS-1 and Rick Jean relating to drug activity which took place in May and

June of 2011. (Tr. 31:20-32:9). At page 36 of the affidavit, Spec. Agt. Davis outlined the necessity for the use of wire interception of communications for Target Telephone #1. (Tr. 32:14-17). At page 38 of the affidavit, he outlined the goals of the investigation which remained unfulfilled. (Tr. 32:18-21). After received authorization from Judge Steele on July 12, 2011, he began to intercept communications occurring over Target Telephone #1. (Tr. 32:22-24). Some of those conversations pertained to Neheme Ductant. (Tr. 32:24-33:3).

In the second affidavit and application for the continuing interception of Target Telephone #1, as well as the original interception of Target Telephone #2, Spec. Agt. Davis outlined those communications which were intercepted which were pertinent to the investigation at page 28. (Tr. 33:4-10). At page 45 of the affidavit for Target Telephone #2, Davis outlined the necessity of continuing to intercept communications over Target Telephone #1, as well as the original interception. (Tr. 33:11-16). Prior to the application for Target Telephone #2, he was unaware of the true identity of the source of cocaine that was being utilized by the DTO. (Tr. 33:17-24).

On cross-examination, Spec. Agt. Davis testified that CS-1 was able to purchase crack cocaine from a member of the DTO. (Tr. 37:18-38:2). CS-1 was familiar with the drug distribution activity and purchased crack cocaine at a drug distribution house. (Tr. 38:11-25). Spec. Agt. Davis conceded that CS-1 provided valuable intelligence to the investigation, including that powder cocaine was converted to crack cocaine by the DTO members at the distribution houses. (Tr. 39:7-18). CS-1 was also able to purchase more crack cocaine after a distribution house was moved to a new location. (Tr. 41:9-14). CS-1 also advised Hyppolite and Ductant were selling crack from a distribution house in North Fort Myers, Florida, which was valuable. (Tr. 41:15-42:3). CS-1 also advised that an individual had been severely beaten at a

drug distribution house because he no longer wanted to sell drugs for the organization. DTO members kept him at the house to show individuals what happens when you mess with the organization. (Tr. 42:20-45:16).

CS-2 advised Spec. Agt. Davis during the investigation that DTO members rarely travel with large quantities of cocaine. (Tr. 54:20-23) CS-2 informed investigators that the members preferred to ship cocaine using the United States Postal Service and that he or she personally witnessed Minerva Jean, who was Sereme's girlfriend in 2010, place approximately 1.5 kilos of cocaine in a hollowed out radio and ship it. (Tr. 55:6-14). Through surveillance, investigators were able to see members of the DTO use a Publix in Fort Myers Beach to make Western Union transactions to send U.S. currency from Fort Myers to Miami, Florida. (Tr. 56:14-24).

CS-3 was able to purchase crack cocaine from W. Jean at one of the distribution houses in April 2011. (Tr. 58:7-22). During the June and July 2011, CS-3 sent text messages to R. Jean on the Target Telephone to buy crack cocaine from Defendant Hyppolite at R. Jean's distribution house. (Tr. 59:17-61:1). CS-3 informed investigators that the DTO was operating out of the Linda Loma neighborhood in Fort Myers Beach. (Tr. 61:15-19). Spec. Agt. Davis testified on cross-examination that they still do not know the source of supply from Miami. (Tr. 70:1-4).

On re-direct, Spec. Agt. Davis testified and reiterated the areas of the investigation where they still did know certain things, including the exact method of transportation of controlled substances, who Rick Jean was being supplied cocaine by, the true subscribers of the telephones associated with the phone tolls, the content of conversations, what was going on inside the distribution houses, and the relationships between certain individuals. (Tr. 80:23-82:20).

## **DISCUSSION**

Defendant Ductant moves to suppress the information obtained by law enforcement as a result of the Title III wiretaps (Def. Ex. 1-2) on the grounds that other investigative procedures were in place and working well and would reasonably appear to succeed if continued. He maintains that the court orders permitting the use of wire and electronic interceptions should not have been issued as the Government failed to meet its burden of showing "necessity" in the affidavits as set forth in 18 U.S.C. § 2518(1)(c).

Pursuant to 18 U.S.C. § 2518(1)(c), an application for an order authorizing the interception of wire communications must include:

> A full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

"The necessity requirement is designed to ensure that electronic surveillance is neither routinely employed nor used when less intrusive techniques will succeed." United States v. Van Horn, 789 F.2d 1492, 1496 (11th Cir. 1986). "The affidavit in support of a search warrant must simply explain the retroactive or prospective failure of several investigative techniques that reasonably suggest themselves. However, a comprehensive exhausting of all possible investigative techniques is not necessary before applying for a wiretap." United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 (11th Cir. 2010) (quotation marks and citations omitted). Wiretap affidavits are evaluated in a "common sense fashion," and "the determination of when the Government has satisfied [the statutory] requirement must be made against flexible standards, and ... each case must be examined on its own facts." United States v. Hyde, 574 F.2d 856, 867 (5th Cir. 1978). "The 'necessity' requirement in § 2518 ensures that law enforcement does not use electronic surveillance when less intrusive methods will suffice." United States v. Perez, 661 F.3d 568, 581 (11th Cir. 2011) (citing United States v. Kahn, 415 U.S. 143, 153 n. 12,

94 S.Ct. 977, 983, n.12, 39 L.Ed.2d 225 (1974) (stating that § 2518 "is simply designed to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."). "Section 2518 does not 'foreclose electronic surveillance until every other imaginable method of investigation has been unsuccessfully attempted,' United States v. Alonso, 740 F.2d 862, 868 (11th Cir. 1984) (quoting United States v. Hyde, 574 F.2d 856, 867 (5th Cir.1978)); however, it does require the Government to show why alternative measures are inadequate for 'this particular investigation.'" Id. (quoting United States v. Carrazana, 921 F.2d 1557, 1565 (11th Cir. 1991); United States v. Ippolito, 774 F.2d 1482, 1486 (9th Cir. 1985)) (emphasis omitted)).

In the wiretap warrant affidavits, Spec. Agt. Davis stated in the "necessity" and "other investigative techniques" sections (Def. Ex. 1 & 2, pp. 36-60) that normal investigative methods have failed, have had limited success, would be unlikely to succeed if tried, and are too dangerous to attempt. He stated it was his belief that wire and electronic communications intercepted over the Target Telephone #1 would reveal the full scope of the conspiracy as it pertains to the acquisition, transportation, and distribution of narcotics and the laundering of drug proceeds by the DTO. He also outlined the investigative techniques that had been employed to that date.[2]

---

[2] Law enforcement began utilizing CS-1 on September 18, 2010. CS-1 had direct access to defendants Sereme, Francois and Hyppolite and had known them for years. A monitored phone call was made from CS-1 to Sereme to arrange for the purchase of crack cocaine. CS-1 did purchase crack cocaine from one of the distribution houses. CS-1 informed agents that the Haitian MOB was behind the crack distribution that the agents were investigating. He described for agents in detail how the cocaine is transported and converted to crack. The information was verified by agents. (Def. Ex. 1, pp. 13-17).
    On September 2, 2010, agents conducted a fugitive investigation and came upon defendant Francois at a distribution house along with other Haitian MOB members. Agents discovered crack and powder cocaine as well as materials used to convert powder cocaine to crack cocaine. After the incident, the distribution house closed and another opened in its place. CS-1 was able to locate the new distribution house and inform agents of its location.
    CS-1 advised agents that defendant Hyppolite was selling crack cocaine from a distribution house in N. Ft. Myers along with Ductant. This information was verified by agents. CS-1 gave the agents information as to how the DTO operated which included its members (and defendants) such as Ductant, Hyppolite, Sereme, and Francois. CS-

1 informed agents about an incident involving members of the DTO in which a member of the DTO was beaten and held for ransom. Agents verified this information after conducting surveillance which was videotaped and obtaining money wire transfer receipts.

In January 2011, agents utilized CS-2 to infiltrate the DTO. (Def. Ex. 1, pp. 17-22). CS-2 was a friend of defendant Sereme and sold narcotics with him. CS-2 also knows R. Jean and Francois. CS-2 advised agents about the source of supply for the drugs used by the DTO. CS-2 advised that R. Jean and Francois were Haitian MOB members and come from Miami. CS-2 helped set up drug distribution locations in N. Ft. Myers and Ft. Myers Beach. He informed agents about the DTO drug distribution houses were set up and where. He informed agents about the identities of the DTO members who were running the houses. Agents verified this information with other agents who had made controlled buys from several drug distribution houses where Miami DTO members were located. CS-1 also verified this information by providing agents with the locations of the DTO drug distribution houses and the members of the DTO that were selling drugs from the houses.

CS-2 worked for Sereme as a member of the DTO. CS-2 met and had knowledge about alleged DTO defendants W. Jean, Desir and Hyppolite. CS-2, CS-1 and CS-3 informed agents that the DTO purchased cocaine from a source in Miami who would regularly travel to Miami to purchase cocaine. Agents verified this information after the arrest of Sereme in December 2010. Sereme was arrested for possession of cocaine on his way back to Ft. Myers from Miami. GPS tracking was used by agents on Sereme's cell phone to determine his location. Also agents obtained information about the rental car Sereme used. Sereme was found to have three ounces of cocaine powder on his person and arrested. While Sereme was in jail for the above arrest, his jail phone calls were recorded. Sereme called R. Jean and told him to be careful. They talked about the performance of one of the drug distributors. They frequently discussed "manje" which CS-2 described as code for crack cocaine. R. Jean and Sereme would frequently talk about other DTO members including known distributors. From these conversations and information given by CS-2, agents determined that R. Jean was overseeing Sereme's Fort Myers Beach neighborhood while Sereme was in jail.

In 2010, CS-2 traveled to Miami with Sereme and M. Jean (Sereme's girlfriend) to pick up large quantities of cocaine. CS-2 advised agents that the DTO would ship cocaine using USPS or UPS.

CS-2 informed agents that Haitian MOB members do not like to transport large amounts of U.S. currency on their person for fear of it being seized by law enforcement. This information was corroborated by agents through the use of surveillance. On April 14, 2011, agents observed a vehicle registered to W. Jean pull into a Publix parking lot. R. Jean was driving. Passenger Cenatus went into Publix where he conducted a Western Union transaction. For the next several weeks, agents observed (surveillance) W. Jean, R. Jean, and Francois, use the same Publix to conduct Western Union transactions. With the exception of Cenatus' transaction, agents were able to determine that all of the transactions involved Haitian MOB DTO members sending U.S. Currency from Ft. Myers to Miami. The recipients of the transactions are under investigation by agents. Spec. Agt. Davis noted though in his affidavit that CS-2 was not in a position to purchase large quantities of narcotics from Haitian MOB DTO members. (Def. Ex. 1, p. 53).

Agents began utilizing CS-3 in April of 2011. (Def. Ex. 1, p. 22-24). Agents used CS-3 to purchase narcotics from the DTO (controlled buys). CS-3 knows and has had telephone contact with R. Jean, W. Jean, Desir, Hyppolite, and Francois. CS-3 had been purchasing crack cocaine from DTO members for over a year. In April of 2011, CS-3 made a recorded call to W. Jean to purchase crack cocaine (controlled buy). CS-3 met W. Jean at his distribution house and purchased crack from W. Jean.

In May of 2011, CS-3 called R. Jean to purchase crack (controlled buy). R. Jean told CS-3 that he was not at the distribution house but his brother W. Jean was and to go there. CS-3 went to the distribution house and purchased crack cocaine from W. Jean. CS-3 informed agents that Hyppolite was also present at the distribution house during the sale. Spec. Agt. Davis noted in his affidavit though that CS-3 was not in a position to further the investigation. (Def. Ex. 1, p. 53).

During the course of this investigation, agents installed a telephone pole camera in the Loma Linda neighborhood near Ft. Myers Beach. The camera was focused on a parking lot of the apartment complex at one of the distribution houses. It is where R. Jean's vehicle was mostly located. The cameras were successful in showing what, in the agents opinion, is evidence of drug trafficking. The camera surveillance has shown R. Jean, W. Jean, Francois, Trevil, Desir and Hyppolite coming and going from this location. A second pole camera was later used by agents.

A pen register/trap and trace court order was obtained on June 3, 2011 on Target #1 phone. Agents analyzed tolls for Target #1 phone and other phones for DTO members. The results show that DTO members place and receive phone calls from each other. R. Jean uses multiple cell phones, uses fictitious or fraudulent subscriber

According to Spec. Agt. Davis' affidavits as outlined above and testimony, wire interception was necessary in this case because the traditional investigative techniques used during the investigation of the DTO have been attempted and failed, or appear reasonably unlikely to succeed because of the particular circumstances of this case, or are too dangerous to employ. (Def. Ex. 1, p. 37). "In probable cause determinations, a totality of the circumstances analysis applies, and '[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" United States v. Holt, 408 Fed. Appx. 229, *4 (11th Cir. 2010) (quoting Illinois v. Gates, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983)).

"The partial success of alternative investigative measures, however, does not necessarily render electronic surveillance unnecessary." Perez, 661 F.3d 581-82 (citing United States v. Fernandez, 388 F.3d 1199, 1236-37 (9th Cir. 2004) (concluding that the Government met the "necessity" requirement despite "two confidential informants ... [who] were able to provide significant information"). "Indeed, we have held that district courts did not err under similar circumstances." Id. (citing United States v. De La Cruz Suarez, 601 F.3d 1202, 1214 n.7 (11th Cir. 2010) (finding that the "necessity" requirement was met despite the Government's use of confidential informants and consensual monitoring)). It "is unrealistic to require the termination

---

information and randomly change their phone numbers. Agents analyzed historical toll records to determine that Target #1 phone is used to contact members of the Haitian MOB DTO. Through Toll analysis agents were able to determine the number of calls, both incoming and outgoing on DOT members. Agents were able to show that DOT members called each other and the amount of times, and dates that these calls were made.

Toll records have shown that 139 calls were made to or received from 786-263-2327. CS-3 confirmed that 786-263-2327 belongs to defendant Sanders. CS-3 used text messaging to communicate with R. Jean to purchase crack cocaine. In addition, R. Jean sent/received 13 text messages from Target #1 phone to Sanders phone. R. Jean sent/received 651 text messages from 20 different recipients.

12

of an investigation before the entire scope of the [conspiracy] is uncovered and the identity of its participants learned." Perez, 661 F.3d at 582.

The Court recommends that the application for the wiretap order demonstrated the need for electronic surveillance. Spec. Agt. Davis testified that there were significant limitations on the confidential sources that were being used and that the information they were obtaining was mostly historical. For example, Spec. Agt. Davis testified that there were many things law enforcement still did not know at the time he applied for the wiretaps even though confidential sources had been used, including who the supplier was, how proceeds were provided, how shipments were made, and how the shipments were transported. (Tr. 80:23-82:20). He also testified that there were limitations on physical surveillance and pole cameras as these methods did not identify the goings-on inside the houses and other areas where the Defendants went. (Tr. 30:15-21). He further testified that he did not know the roles of the different Defendants, the source of the cocaine conversion to crack cocaine, nor the relationship between individuals they were monitoring. (Tr. 28:13-15). He also testified that the information that the confidential sources provided was mostly historical in nature. (Tr. 24:24-25:4; 25:16-23).

The Agent's affidavit recounted numerous ways in which the Government's investigation failed to reveal important evidence. The affidavits noted that CS-1 was unable to make any controlled buys (Def. Ex. 1, p. 52; Def. Ex. 2, p. 63) and DTO members were suspicious that CS-2 was assisting law enforcement and some members wanted to kill him. (Def. Ex. 1, p. 53; Def. Ex. 2, pp. 63-64). Finally, CS-3 had only been able to make small purchases of crack cocaine and was not comfortable making larger purchases. (Def. Ex. 1, pp. 53-54; Def. Ex. 2, p. 64)). The warrant applications described in detail how multiple conventional investigative techniques, including surveillance, subpoenas, interviews, undercover police officers, and trash pulls, had

either been used or would be unhelpful in the future. This was supported by Spec. Agt. Davis' testimony.

Because the Government has demonstrated that the use of non-wiretap investigatory techniques were sufficiently exhausted, the allowance of the use of wiretaps was proper and therefore it is recommended that the motion to suppress the wiretap evidence be denied.

*Defendants' Motions to Adopt*

As stated on the record by the undersigned, certain Defendants who have moved to join Ductant's Motion to Suppress and adopt his arguments as their own lack standing to do so. It is well established that in order for a defendant to move to suppress evidence, he must have standing. United States v. Eyster, 948 F.2d 1196, 1208-09 (11th Cir. 1991). A defendant has the burden of showing standing under the Fourth Amendment standard. United States v. Brazel, 102 F.3d 1120, 1147 (11th Cir. 1997). To claim the protection of the Fourth Amendment, an individual must have a "reasonable expectation of privacy in the invaded place." Rakas v. Illinois, 439 U.S. 128, 143 (1978). A defendant's expectation must be "personal[ ]" and "reasonable," and it must have "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Minnesota v. Carter, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998) (citations and internal quotations omitted). "Standing does not require an ownership interest in the invaded area." United States v. Hernandez, 647 F.3d 216, 219 (5th Cir. 2011) (noting that the Supreme Court has recognized that an overnight guest in a home has a legitimate expectation of privacy in that home).

In order to contest an order permitting the interception of communications, a defendant must establish that he was an "aggrieved person." 18 U.S.C. § 2518(10)(a). Such a person is

14

defined in the relevant statute as a "person who was a party to an intercepted ... communication or a person against whom the interception was directed." 18 U.S.C. § 2510(11). The statute further allows that an "aggrieved person" may "move to suppress the contents of any ... communication intercepted pursuant to this chapter." 18 U.S.C. § 2518(10)(a). Courts have found that where a defendant does not show any possession, ownership, or control over a phone and the phone was not registered in his name, he does not have standing to challenge the data derived from it. See United States v. Degaule, 797 F. Supp. 2d 1332, 1362 (N.D. Ga. 2011); United States v. Skinner, No. 3:06–CR–100, 2007 WL 1556596, at *15, *17 (E.D. Tenn. May 24, 2007) (finding defendant lacked standing to assert a Fourth Amendment protected interest in cell phone not subscribed in his name and had no statutory right to privacy in the phone); United States v. Castillo–Martinez, No. 04–CR–6128L, 2007 WL 1026363, at *5 (W.D.N.Y. Apr. 2, 2007) (finding that defendant did not have a privacy interest in cell phone number that was not registered or used by the defendant).

The Court heard argument from Defense Counsel on this issue. (Tr. 6:10-17:15). With regard to Defendant Francois, no standing was shown by counsel as there was no showing that his phone was tapped or his conversations were intercepted. (Tr. 13:2-9). With regard to Defendant Bonita, no standing was shown as it is not alleged that his conversations were intercepted. (Tr. 17:4-12). The undersigned found under separate Order that the remaining Defendants who moved to join the Motion to Suppress Wiretap Evidence – Sereme (Doc. #184), Hyppolite (Doc. #182, 187), R. Jean (Doc. #183), and W. Jean (Doc. #185) – had standing to do so.[3]

Accordingly, it is now

---

[3] Therefore, these Defendants may file written objections to these proposed findings and recommendations within 14 days as well.

**RESPECTFULLY RECOMMENDED:**

(1) Neheme Ductant's Motion to Suppress Wiretap Evidence (Doc. #118) be **DENIED**.

(2) Rashid Francois' Renewed Motion to Adopt Co-Defendant's Motion to Suppress Wiretap Evidence (Doc. #162) be **DENIED**.

(3) Eric Bonita's Renewed Motion to Adopt Co-Defendant's Motion to Suppress Wiretap Evidence (Doc. #165) be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully recommended** at Fort Myers, Florida, this 26th Day of March, 2012.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record